RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
SEAN A. MCCLELLAND
Assistant Federal Public Defender
Nevada State Bar No. 16581
200 South Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451
Sean_McClelland@fd.org

Attorney for TYLER MONSON

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:25-cr-00006-MMD-CLB |
| Plaintiff, | **MOTION FOR DISTRICT JUDGE REVIEW OF MAGISTRATE JUDGE'S DETENTION ORDER** |
| v. | |
| TYLER MONSON, | [Hearing requested][1] |
| Defendant. | |

---

[1] This motion is timely filed. *See* LCR 12-3 (detention appeals "must be filed and served without undue delay"). The government's basis for seeking detention, and the magistrate judge's basis for granting detention, relied almost exclusively on the allegations in the case and the government's proffer about the alleged conduct. As a result, the defense could not seek review of the detention order until counsel was in possession of the relevant discovery providing the basis for the government's proffer. Defense counsel received the bulk of the relevant discovery on February 19, 2025. This motion is filed within two days of receiving that initial batch of discovery.

The defense notes that the government has not yet provided additional discovery, which the defense believes may include a forensic interview of the alleged victim. The government proposed a protective order for an undefined set of discovery (possibly including that forensic interview) on Friday, February 7, 2025, which the defense responded to with a set of requested revisions and clarifications on Monday, February 10, 2025. The government has not yet responded to the defense's requests. Even so, the defense believes that most of the relevant information is contained in the initial batch of discovery not subject to the protective order. The defense reserves the right to supplement this filing, as appropriate, if it receives additional discovery.

## I. INTRODUCTION

Mr. Monson is a 27-year-old Marine Corps veteran and lifelong Northern Nevada resident with no prior convictions of any stripe. He turned himself in to law enforcement the very same day he heard authorities were looking for him. And he has significant family support—and significant employment opportunities—should he be released. This Court should order him released on conditions while his case proceeds.

## II. BACKGROUND[2]

Mr. Monson is a 27-year-old Marine Corps veteran with no prior convictions of any kind. Outside of his military service and a brief stint in Brazil, he has lived his entire life in Northern Nevada. His father, stepmother, and stepsister (who has offered to allow Mr. Monson to live with her) live in Winnemucca. His mother (who has also offered to allow Mr. Monson to live with her) lives in Spring Creek, near Elko. Mr. Monson works as a heavy equipment operator in the mining and construction industry. He anticipates returning to that work if he is released.

In late 2024, Mr. Monson allegedly communicated online with what turned out to be a 15-year-old Colorado resident for about a week. ECF No. 1 at 4–5. Those communications started on OmeTV, a camera chat application that randomly pairs users for brief video chats. Per that app's website, the "service" "can only be used by adults as per their country's legal age" and "[m]inors are strictly prohibited."[3] Similarly, that app's age rating is 17+ on both Apple's App Store and Google's Google Play portal. Discovery further suggests that, while on the app, the alleged victim initially told Mr. Monson that she was 18 years old, before later

---

[2] Some of the information referred to below relates in part to information from the Pretrial Services Report. That document was produced by the Pretrial Services officer for the magistrate judge's detention hearing.
  Other information is drawn from the complaint affidavit, ECF No. 1, or from the initial batch of discovery the government provided on February 19, 2025. The defense reserves the right to supplement this filing as necessary considering additional discovery.

[3] OmeTV, OmeTV Rules and Regulations – Safe and Fun Live Video Chat, https://ome.tv/rules/.

2

telling him her actual age. The communications soon moved to Snapchat, an application that allows users to share pictures, videos, and messages. *See* ECF No. 1 at 4–5. And during these communications, the alleged victim sent Mr. Monson nude photographs, which Mr. Monson allegedly reciprocated. *Id.*

The alleged victim then coordinated with Mr. Monson to have him come visit her in Colorado. *Id.* In response, Mr. Monson allegedly came to Colorado and spent a day (December 31) with the alleged victim, during which Mr. Monson allegedly "performed sexual activity with [the alleged victim], rubbing her clitoris with his fingers." *Id.* at 5. The alleged victim then returned home, apparently without incident. *Id.*

Two days later (on January 2), Mr. Monson allegedly picked up the alleged victim near her house. *Id.* The two then traveled to Salt Lake City, Utah. *Id.* at 5–6. During that travel, they allegedly engaged in further sexual activity—again with Mr. Monson allegedly using his "finger" to "stimulat[e]" the alleged victim. *Id.* at 6. While in Salt Lake City, Mr. Monson and the alleged victim allegedly visited two malls and engaged in some additional sexual activity, again with Mr. Monson using his "fingers and palm" and once "h[o]ld[ing] one of [the alleged victim's] breasts." *Id.* Mr. Monson also allegedly told the alleged victim that he was interested in further sexual activity, including potentially genital–genital, oral–genital, or using a "vibrator." *Id.* at 6–7. There is, however, no sign Mr. Monson and the alleged victim ever engaged in any such sexual activity. *See id.* The two then began travelling towards Nevada. *See id.* Around the same time that day (January 2), officers allegedly began looking for Mr. Monson, visiting his family member's homes in Northern Nevada. *See id.* at 7.

After hearing that officers were looking for him, Mr. Monson turned himself in to authorities in Elko, Nevada, the very same day (January 2). *Id.* at 4. In connection with Mr. Monson doing so, law enforcement officers interviewed him without an attorney present. *See id.* During that interview, Mr. Monson told officers various details about the alleged offense. *Id.*; *see generally id.* at 4–7 (alleging various facts derived from Mr. Monson's interview).

3

About a week later, the government charged Mr. Monson with transporting a minor with the intent to engage in criminal sexual activity. ECF No. 1 (complaint); *see* ECF No. 17 (indictment with same charge). If convicted of that charge, Mr. Monson would face a ten-year mandatory-minimum sentence. *See* 18 U.S.C. § 2423(a). At his detention hearing, the assigned magistrate judge detained Mr. Monson over defense objection. *See* ECF No. 5.

Mr. Monson now seeks district court review of that detention decision. He asks that he be released on conditions pending trial.

### III.    LEGAL STANDARDS

A district court judge reviews a magistrate judge's detention order entirely *de novo*—a form of review that, in this context, applies to both law and facts. *United States v. Koenig*, 912 F.2d 1190, 1192–93 (9th Cir. 1990). As a result, this Court need not defer to any conclusions or findings by the magistrate judge. *Id.* at 1193 ("[T]he ultimate determination of the propriety of detention is . . . to be decided without deference to the magistrate's ultimate conclusion."). A district court judge can also consider evidence beyond that considered by the magistrate judge—including, for instance, additional materials on rehabilitation or treatment options. *Id.* In brief: a district judge redoes the detention analysis from scratch. *Id.* at 1192–93.

The default rule is release. Per the statute, a court "shall" order a defendant released on the "least restrictive" conditions necessary to address potential danger or risk-of-nonappearance issues. 18 U.S.C. § 3142(c). Only if "no condition or combination of conditions" "will reasonably assure the appearance of the person as required and the safety of any other person and the community" is detention appropriate. *Id.* § 3142(e); *see also Santos-Flores*, 794 F.3d at 1090 (identifying that detention is only for "rare cases"). In that analysis the government must prove any alleged dangerousness issues specifically by clear and convincing evidence. 18 U.S.C. § 3142(f).

In evaluating whether the government has met its burden to justify pretrial detention, courts evaluate the so-called § 3142(g) factors, including:

1.    the nature and circumstances of the offense charged, *id.* § 3142(g)(1);

4

2.    the weight of the evidence against the defendant, *id.* § 3142(g)(2);

3.    the history and characteristics of the defendant, *id.* § 3142(g)(3), including, as specifically relevant here, his "family ties," "employment," "length of residence in the community," "community ties," "past conduct," "criminal history," and "record concerning appearance at court proceedings," *id.* § 3142(g)(3)(A); and

4.    the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release, *id.* § 3142(g)(4).

These factors are, however, unevenly weighted. The first (nature-and-circumstances of the offense) and second (weight of the evidence) are the "least important." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). Those two matter "only" to the extent they affect "the likelihood that the person will fail to appear or will pose a danger to any person or to the community." *Id.* If those factors are read for anything more, "the court impermissibly makes a preliminary determination of guilt, [and] the refusal to grant release could become in substance a matter of punishment." *Id.* In the mine-run of cases, then, the other factors—history-and-characteristics and particularized danger (if any)—ordinarily control. *See id.*

In this framework, some charges (including the one here) carry a "presum[ption]" in favor of detention. 18 U.S.C. § 3142(e)(3)(E). But that presumption is a limited one. It imposes only a burden of production on the defense—the burden of persuasion to justify pretrial detention remains with the government. *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985); *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986). Accordingly, even where the presumption applies, the government always bears the burden of convincing the Court that detention is warranted. *Jessup*, 757 F.2d at 384; *Dominguez*, 783 F.2d at 707.

Moreover, "the burden placed on the defendant to rebut the presumption is small." *United States v. Chen*, 820 F. Supp. 1205, 1207 (N.D. Cal. 1992); *see also Dominguez*, 783 F.3d at 707 ("The burden of production is not a heavy one to meet[.]"). A defendant need only produce "some evidence that he will not flee or endanger the community if released." *Dominguez*, 783 F.2d at 707; *see also Jessup*, 757 F.2d at 384 ("In order to 'rebut' the presumption, the defendant must produce some evidence" in rebuttal.). And that can be done

by offering "[a]ny evidence favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(3)." *Dominguez*, 783 F.2d at 707. Then, once the presumption is rebutted, "it remains in the case as an evidentiary finding . . . to be weighed along with other evidence relevant to factors listed in § 3142(g)." *Id.*

Taken together, then, pretrial detention is appropriate only in "rare cases." *Santos-Flores*, 794 F.3d at 1090; *see generally, e.g.*, ALISON SIEGLER, FREEDOM DENIED: HOW THE CULTURE OF DETENTION CREATED A FEDERAL JAILING CRISIS 15–18 (2022) (identifying this principle and noting various ways courts have misapplied the Bail Reform Act to improperly erect a "culture of detention"). "In our society liberty is the norm and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). So, absent "rare" circumstances, a defendant should be released on conditions. *Santos-Flores*, 794 F.3d at 1090.

## IV.   ARGUMENT

Mr. Monson is not one of the "rare cases" that warrant pretrial detention. *Santos-Flores*, 794 F.3d at 1090. As the § 3142(g) factors confirm, whatever concerns he might present can be addressed with appropriate conditions of pretrial supervision. The Court should thus order Mr. Monson released on conditions.

### A.   The § 3142(g) factors favor release on conditions.

#### 1.   Nature and circumstances of the alleged offense.

To begin, the nature and circumstances of the alleged offense do not favor detention. 18 U.S.C. § 3142(g)(1). To be sure, Mr. Monson faces a serious charge. *See* ECF No. 17. He is charged with allegedly transporting a 15-year-old with the intent to engage in criminal sexual activity. *See id.* That charge carries a mandatory minimum sentence. The face of the indictment, then, is serious. But Mr. Monson is presumed innocent of the charge—making this factor one of the least important. *Motamedi*, 767 F.2d at 1408 ("Although the statute permits

6

the court to consider the nature of the offense and the evidence of guilt, the statute neither requires nor permits a pretrial determination that the person is guilty.").

And the broader circumstances are substantially mitigating. Perhaps most significantly, Mr. Monson turned himself in the very same day that he learned officers might be looking for him. ECF No. 1 at 4. And even beyond that, the alleged details of the offense suggest that Mr. Monson could at least believe that his interactions with the alleged victim were consensual. *See id.* Simply put: he found himself in what he thought was a consensual situation—then immediately turned himself in when he found out that authorities believed he had committed a crime. *See id.* These facts confirm that Mr. Monson is not a particularized danger to the community (or, for that matter, a flight risk). *See id.*

For similar reasons, conditions would mitigate any concerns stemming from the alleged nature and circumstances of this offense. In particular, location-monitoring, travel-restriction, computer-monitoring software, and no-contact conditions would prevent the alleged conduct here from reoccurring—both as to the alleged victim and any other individuals.

### 2. Weight of the evidence.

The defense acknowledges that the weight of the evidence factor likely favors the government. 18 U.S.C. § 3142(g)(2). Most obviously: after turning himself in, Mr. Monson told officers various details about the alleged conduct here. *See* ECF No. 1 at 4–7.[4] But like the nature-and-circumstances factor, the weight-of-evidence factor is one of the "least important" in any detention analysis. *Motamedi*, 767 F.2d at 1408. So its effect here is both minimal and non-dispositive.

---

[4] The defense reserves the right to challenge statements and other evidence as collected in violation of Mr. Monson's constitutional and other rights. Even assuming the government's evidence is all admissible, however, the weight of the evidence does not alone compel pretrial detention. *Motamedi*, 767 F.2d at 1408.

### 3. History and characteristics.

Mr. Monson's history and characteristics strongly favor release on conditions. 18 U.S.C. § 3142(g)(3). Perhaps most significantly, Mr. Monson has virtually no criminal history of any stripe. He has no prior convictions, let alone any violent ones. Indeed, he has only one arrest of any kind: for an alleged threat during his stint in the Marine Corps. And that arrest produced no repercussions—Mr. Monson was not demoted or sanctioned in any way. Quite the opposite, his discharge from the Marine Corps remained general under honorable conditions. Put simply: there is nothing from Mr. Monson's past that suggests he would be a danger to the community or a flight risk if released.

Other considerations confirm the same. Specifically, Mr. Monson's "length of residence in the community," "employment," "family. . . [and] community ties," "past conduct," "physical and mental condition," and "record concerning appearance at court proceedings," all likewise reveal that he would not be a danger to the community or a risk of non-appearance if released on conditions. 18 U.S.C. § 3142(g)(3)(A). In particular:

- Mr. Monson has lived in Northern Nevada virtually his entire life, leaving only to serve in the Marine Corps;
- While in Nevada, Mr. Monson has long worked in the mining industry—earning roughly $4,000 per month. He anticipates that he would be able to return to his job (or an analogous one) if released.
- Mr. Monson has close ties with virtually every member of his immediate family: including his mother Pamelyn Monson, his father Willard Monson, his half sister Kiley Gnerer. So much so that various family members have offered to allow Mr. Monson to reside with them should he be released—including, specifically, his mother Pam and his half-sister Kiley.
- As discussed, Mr. Monson has no prior convictions of any variety. And his other past conduct
- Mr. Monson also has a herniated disc and sciatica. Those conditions have been particularly exacerbated by life in custody, which has required him to sleep on metal and otherwise uncomfortably firm bedding.

8

- Although Mr. Monson has limited exposure to the court system, there is no sign that he has ever missed a court hearing.

The upshot: if Mr. Monson were released on conditions, he could be expected to live and work in Northern Nevada without threat to others, and to appear when necessary for court proceedings. Given all these considerations, the history-and-characteristics factor strongly favors release.

    **4.    Nature and seriousness of the danger to any person or the community posed by release.**

For similar reasons, Mr. Monson's pretrial release would pose minimal danger to any person or the community if accompanied by appropriate conditions. 18 U.S.C. § 3142(g)(4). In particular (and as discussed), location-monitoring, travel-restriction, computer-monitoring software, and no-contact conditions would blunt any potential danger to the alleged victim (and the community more broadly) should Mr. Monson be released. This factor thus does not favor detention.

\*    \*    \*

None of the § 3142(g) factors favor detention. Two—the nature-and-circumstances-of-the-offense and the history-and-characteristics-of-the-defendant—favor release. And the other two are either neutral or could be addressed with appropriate conditions. Taken both individually and collectively, then, the § 3142(g) factors favor pretrial release here.

**B.    Appropriate conditions would address any purported danger to the community or risk of non-appearance.**

Release is especially appropriate because any concerns can be adequately addressed by appropriate release conditions. In particular, the Court can (and should) impose the following conditions:

- that Mr. Monson report to U.S. Pretrial Service for supervision;
- that he be subject to GPS location-monitoring with a curfew condition;
- that his travel be restricted to the District of Nevada;

- that he not use or possess a computer or other internet-capable device unless approved by Pretrial Services, and that any such approved device have computer monitoring software installed;

- that he avoid all contact directly or indirectly with any person who is or may become an alleged victim or potential witness in the investigation or prosecution; and

- that he refrain from possessing a firearm, destructive device, or other dangerous weapon.

These conditions, both individually and collectively, would address any risk of danger or non-appearance posed by Mr. Monson's release.

## V.   CONCLUSION

The § 3142(g) factors do not justify detaining Mr. Monson. Any potential danger or risk of non-appearance can be addressed with appropriate conditions. And even if there were any "doubts" about that analysis, such "doubts" "are to be resolved in favor of the defendant." *Santos-Flores*, 794 F.3d at 1090. Mr. Monson should thus be released on pretrial supervision while his case proceeds.

Dated: February 21, 2025.

RENE L. VALLADARES
Federal Public Defender

By:  */s/ Sean A. McClelland*

SEAN A. MCCLELLAND
Assistant Federal Public Defender