RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
SEAN A. MCCLELLAND
Assistant Federal Public Defender
Nevada State Bar No. 16581
200 South Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451
Sean_McClelland@fd.org

Attorney for TYLER MONSON

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| UNITED STATES OF AMERICA, | Case No. 3:25-cr-00006-MMD-CLB |
|---|---|
| Plaintiff, | **REPLY IN SUPPORT OF MOTION FOR DISTRICT JUDGE REVIEW OF MAGISTRATE JUDGE'S DETENTION ORDER** |
| v. | |
| TYLER MONSON, | |
| Defendant. | [Hearing requested][1] |

**I.   INTRODUCTION**

Mr. Monson is a 27-year-old veteran with no criminal history whatsoever. He turned himself in to officers when he so much as heard they might be looking for him over a hundred miles away. He is an appropriate candidate for pretrial release.

The government's counterarguments are unpersuasive. Mr. Monson should be released on conditions pending trial.

---

[1] This reply is timely filed.

## II. ARGUMENT

Mr. Monson is not one of the "rare cases" that warrant pretrial detention. ECF No. 23 at 6 (quoting *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015)). As the § 3142(g) factors confirm, *id.* at 6–9, whatever concerns he might present can be addressed with appropriate conditions of pretrial supervision, *id.* at 9–10. The Court should thus order Mr. Monson released on conditions. *Id.* at 6–10.

The government does not dispute much of Mr. Monson's analysis. *See generally* ECF No. 28 at 5–8. It does not dispute, for instance:

- that Mr. Monson could have at least believed that his interactions with the alleged victim were consensual;
- that Mr. Monson turned himself in in Elko when he heard officers might be looking for him over a hundred miles away in Winnemucca;
- that Mr. Monson has no criminal history whatsoever;
- that, whatever the underlying cause of Mr. Monson's departure from the Marines, he received a general discharge under honorable conditions; or
- that Mr. Monson has lived in Nevada nearly his whole life, and has a steady job and significant relationships that would both minimize flight risk and ensure that Mr. Monson does not endanger the community.

*Compare* ECF No. 23 at 2–4, 6–9 (identifying all these considerations), *with* ECF No. 28 at 5–8 (not disputing them). Nor does the government claim that Mr. Monson would be a flight risk in any way. *See generally* ECF No. 28 at 5–8.

Instead, the government principally claims that Mr. Monson is allegedly dangerous because of the alleged nature and circumstances of this offense. ECF No. 28 at 5–8; *id.* at 7 (government claiming that Mr. Monson's alleged danger to the community "cannot be overstated"). That is so, the government claims, because Mr. Monson "is an adult who met a child online, drove across multiple states to meet her, drove her back to Nevada despite her telling him that she just wanted to go home, displayed a firearm to her, sexually assaulted her and tried to guilt her into lying for him." *Id.* at 7. And any mitigation stemming from (for

2

instance) Mr. Monson turning himself in is irrelevant because, the government says, he "turn[ed] himself in . . . only . . . because he knew that he was already caught." *Id.* at 6.

The government's danger-to-the-community argument is unpersuasive for at least two reasons.

The first: even on its own terms, the government's account "overstate[s]" Mr. Monson's risk to the community. *Id.* at 7. That account is missing important context. To take just a few examples: preliminary discovery indicates that, far from "display[] a firearm" in anything like a threatening way, Mr. Monson told the alleged victim (in response to her questions) that he (lawfully) had a pistol for self-defense—all without removing the firearm from its long-time location in the side door of his vehicle. *Contra id.* Likewise for the purported efforts to get the alleged victim to "l[ie]." *Cf id.* As the government elsewhere alleges, Mr. Monson himself allegedly told officers all the things he purportedly tried to "guilt [the alleged victim] into lying" on—making the get-victim-to-lie claim either inaccurate, self-defeating, or both. *Cf. id.* at 7. And far from "turn[] himself in . . . only . . . because he knew that he was already caught," Mr. Monson turned himself in when he had no obligation to do so. *Cf. id.* at 6. Indeed, Mr. Monson was in Elko when he heard officers might be looking for him in Winnemucca—over a hundred miles away—but promptly turned himself in to Elko authorities anyway. *Cf. id.* He could have evaded police. He did not. He self-surrendered day-of. These facts substantially mitigate any risk to the community posed by Mr. Monson's release.

The second reason the government's argument is unpersuasive: even if none of the above were true, conditions could properly address any risk at play here. ECF No. 23 at 9–10. In particular, the Court can (and should) impose the following conditions:

- that Mr. Monson report to U.S. Pretrial Service for supervision;
- that he be subject to GPS location-monitoring with a curfew condition;
- that his travel be restricted to the District of Nevada;
- that he not use or possess a computer or other internet-capable device unless approved by Pretrial Services, and that any such approved device have computer monitoring software installed;

3

- that he avoid all contact directly or indirectly with any person who is or may become an alleged victim or potential witness in the investigation or prosecution; and

- that he refrain from possessing a firearm, destructive device, or other dangerous weapon.

*Id.* (proposing these conditions). These conditions, both individually and collectively, would address any risk of danger or non-appearance posed by Mr. Monson's release. *Id.*

The government nonetheless insists that "no conditions" could work here. ECF No. 28 at 7. That is so, the government claims, for two primary reasons:

(1) Mr. Monson's family "obviously" would not support him in following the above conditions, *id.* at 8; and

(2) monitoring Mr. Monson's electronic devices would not work because "it is very easy to get a second device that Pretrial knows nothing about," *id.*[2]

Given these alleged concerns, the government claims that "no conditions can be fashioned" to alleviate the alleged risks Mr. Monson poses. *Id.*

Neither claim suffices.

The first (about Mr. Monson's family) ignores that Mr. Monson's family helped him make the decision to turn himself in on this case. *Contra id.* at 8; *see* ECF No. 23 at 3. Mr. Monson's father, for instance, told him he should go to authorities in Elko the same day Mr. Monson learned officers were looking for him in Winnemucca. By the same token, Mr. Monson and his family know that pretrial release conditions demand strict compliance. And they know that admitting a violation is substantially better than hiding one—just as turning oneself in to authorities is substantially better than running away. So while it is true enough

---

[2] The government also suggests that Mr. Monson should have relayed to Pretrial Services that, roughly five years ago, he was allegedly diagnosed with "adjustment disorder with a depressed mood" while in the Marines. ECF No. 28 at 8. Mr. Monson understood Pretrial Services's inquiry to focus on current diagnoses. More to the point, however, any broader concerns about the import of that alleged diagnosis would be unfounded—both before and after that alleged diagnosis, Mr. Monson has no criminal history of any kind outside the instant case. ECF No. 23 at 2, 8. Even so, Mr. Monson would be willing to abide a pretrial release condition directing a mental health evaluation and/or treatment if the Court would find it helpful.

4

that, like every other family, Mr. Monson's is "loyal[]" to him, the government misunderstands the import of that fact. *Cf.* ECF No. 28 at 8. The "loyalty" of Mr. Monson's family means that they are likely to support him in self-reporting violations—just as it led them to support his self-surrender. *Cf. id.* Mr. Monson's family can thus be reasonably expected to ensure Mr. Monson's compliance with any conditions of release.

And the government's second argument—about the alleged possibility of getting a second device—similarly ignores that there is nothing in Mr. Monson's history suggesting that he would disregard a court order directing him not to do so. *Contra* ECF No. 28 at 8. Quite the opposite, he has no prior violations of any court orders. He has (say) no probation violations or failures to appear. (Indeed, he has no prior convictions for anything at all.) The self-surrender again confirms that significant violations are unlikely here. Mr. Monson abides by even implicit law enforcement directions: he turned himself in when he so much as heard that officers might be looking for him. There is no reason to believe he would disregard an express direction not to possess an unauthorized device.

Moreover, even if there were cause to doubt Mr. Monson's compliance with the computer-monitoring conditions (there is not), his requested conditions impose additional guards to blunt the government's feared danger. Most obviously: the defense-requested GPS location-monitoring condition with a curfew would ensure that Mr. Monson does not leave his home for any improper reason. *See* ECF No. 23 at 9–10. Likewise for travel-restriction and no-contact conditions. *See id.* Taken together—between the location-monitoring, travel-restriction, computer-monitoring software, and no-contact conditions—the Court can be reasonably assured that any alleged danger posed by Mr. Monson's release would be appropriately guarded against. *See id.*

### III.  CONCLUSION

The § 3142(g) factors do not justify detaining Mr. Monson. Any potential danger or risk of non-appearance can be addressed with appropriate conditions. And even if there were any "doubts" about that analysis, such "doubts" "are to be resolved in favor of the defendant."

5

*Santos-Flores*, 794 F.3d at 1090. Mr. Monson should thus be released on pretrial supervision while his case proceeds.

Dated: March 14, 2025.

                                        RENE L. VALLADARES
                                      Federal Public Defender

                                By:  */s/ Sean A. McClelland*
                                      SEAN A. MCCLELLAND
                                      Assistant Federal Public Defender